F I L E D
 Clerk
 District Court

JAN 06 2025

for the Northern Mariana Islands
By_____
        (Deputy Clerk)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                   Plaintiff,<br><br>    v.<br><br>STEVEN VILLAGOMEZ PANGELINAN,<br><br>                   Defendant. | Case No.: 1:24-cr-0020-01<br><br>**MEMORANDUM DECISION DENYING PETITION TO REVOKE PRETRIAL RELEASE** |

## I.      INTRODUCTION

Before the Court is a Petition for Action on Conditions of Pretrial Release ("Petition") filed by U.S. Probation Officer Juanette David-Atalig and joined by Assistant U.S. Attorney Albert S. Flores, Jr. (ECF No. 39), supported by the declaration of David-Atalig (Decl., ECF No. 39-1) all pursuant to 18 U.S.C. § 3148(b), which governs sanctions for violating release conditions. It is alleged that Pangelinan violated his terms of pretrial release by using methamphetamine, as indicated by two sweat patches applied on his person that were subjected to laboratory analysis and reported to be positive for methamphetamine. (Decl. at 2–3.) Pangelinan denies using any illicit drugs and contested the results "because I'm testing negative at the Drug Court." (*Id.* at 3.) The Petition was supplemented with the results of two additional sweat patches affixed on Pangelinan that were tested by the laboratory and reported as positive for the presence of methamphetamine. (Suppl. Decl., ECF No. 45.) The Court held an evidentiary on December 10, 2024 (Dec. 10, 2024 Mins., ECF No. 49) and heard arguments from counsel the next day (Dec. 11, 2024 Mins., ECF No. 51.) Based on the evidence received, the Court

concluded that the Government had established by clear and convincing evidence that Pangelinan violated a condition of his pretrial release. (Dec. 12, 2024 Mins., ECF No. 52.) However, rather than revoking Pangelinan's pretrial release as requested by the Government, the Court modified Pangelinan's conditions of pretrial release to instate home confinement with electronic monitoring. (*Id.* at 1.) The Court now issues this decision to memorialize its rationale.

## II.     PROCEDURAL BACKGROUND

On September 12, 2024, a grand jury returned an indictment against Pangelinan and co-Defendant William J. Cabrera Jr. charging both with one count of conspiracy to transport illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I). (ECF No. 1.) The Indictment also included a forfeiture allegation pursuant to 18 U.S.C. § 982(a)(6)(A), 8 U.S.C. § 1324(b)(1), and 28 U.S.C. § 2461(c). At his initial appearance and arraignment held on September 18, 2024, Pangelinan entered a plea of not guilty as to the sole count in the Indictment and a jury trial was set for November 19, 2024. (ECF No. 6.)  After his arraignment, Pangelinan was released and ordered to abide by the terms and conditions of his release. (*Id.*; Order Setting Conditions of Release, ECF No. 10.) Pangelinan's Conditions of Release included condition (7)(m): The defendant must "not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner." (Order Setting Conditions of Release at 2.)

Between September 23 to 30, 2024, a first sweat patch was applied on Pangelinan's arm. (Decl. at 2.) On November 5, 2024, the laboratory test for the first sweat patch confirming the presence of methamphetamine was received by the U.S. Probation Office ("USPO"). (*Id.*) Pangelinan adamantly denied using illicit substances and suggested the positive result could be from "second-hand smoke."

2

(*Id.*) Between October 17 to 21, 2024, a second sweat patch was applied on Pangelinan's arm. (*Id.* at 3.) On November 7, 2024, the laboratory test for the second sweat patch confirming the presence of methamphetamine was received by USPO. (*Id.*) Pangelinan again denied illicit drug use and stated, "I will contest the result because I'm testing negative at the Drug Court." (*Id.*) The two positive sweat patch tests results were the bases for the Petition. On November 7, 2024 the Court ordered that a summons be issued for Pangelinan. (ECF No. 40.) During his initial appearance on the Petition, Pangelinan entered a denial that he had violated any condition of his pretrial release. (ECF No. 42.) Accordingly, the Court set an evidentiary hearing and discovery deadlines related to the hearing. (*Id.*)

After the filing of the Petition and Pangelinan's initial appearance, USPO received two additional positive sweat patch test results. Between November 1 to 5, 2024, a third sweat patch was applied on Pangelinan's arm. (Suppl. Decl. at 3.) On November 20, 2024, the laboratory test for the third sweat patch confirming the presence of methamphetamine was received by USPO. (*Id.*) Between November 12 to 18, 2024, a fourth sweat patch was applied on Pangelinan's arm. (*Id.*) On November 29, 2024, the laboratory test for the fourth sweat patch confirming the presence of methamphetamine was received by USPO. (*Id.*) When Pangelinan was confronted with the positive test result for the fourth sweat patch, he again denied any illicit drug use. (*Id.*) At the evidentiary hearing, Pangelinan entered a denial that he had violated any condition of his pretrial release in response to the positive third and fourth sweat patch test results.

**III.   LEGAL STANDARD**

18 U.S.C. § 3148(b) governs proceedings regarding revocation of pretrial release. It reads, in relevant part:

> **(b) Revocation of release.**--The attorney for the Government may initiate a proceeding for revocation of an order of release by filing a motion with the district court. . . The judicial officer shall enter an order of revocation and detention if, after a hearing, the judicial officer—
>
>   **(1)** finds that there is—
>     **(A)** probable cause to believe that the person has committed a Federal, State, or local crime while on release; or
>     **(B)** clear and convincing evidence that the person has violated any other condition of release; and
>
>   **(2)** finds that—
>     **(A)** based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety or any other person or the community; or
>     **(B)** the person is unlikely to abide by any condition or combination of conditions of release. . .
>
> If the judicial officer finds that there are conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community, and that the person will abide by such conditions, the judicial officer shall treat the person in accordance with the provisions of section 3142 of this title and may amend the conditions of release accordingly.

## IV. DISCUSSION

The Government argued that revocation of Pangelinan's pretrial release was appropriate under 18 U.S.C. §§ 3148(b)(1)(B) and (b)(2)(B). Based on Pangelinan's positive sweat patch test results and two witnesses' testimony about sweat patch testing, the Court found that the Government had met its burden in proving that Pangelinan violated a condition of his pretrial release by using methamphetamine on at least four occasions. The Court found so despite Pangelinan's numerous negative urinalysis ("UA") test results from tests administered by the CNMI Superior Court Drug Court ("Drug Court") staff. However, the Court ultimately denied the Government's petition for pretrial detention after it did not find that Pangelinan was unlikely to abide by any condition or

combination of conditions of release as required by 18 U.S.C. § 3148(b)(2)(B).

**A. The Parties' Evidence**

At the evidentiary hearing, the Government presented four witnesses: Richard Sheriff, regulatory compliance manager and toxicologist for Clinical Reference Laboratory ("CRL"); Dr. Leo J. Kadehjian, a Biomedical Consultant and forensic toxicologist; and USPO Officers Juanette David-Atalig and Gregory Arriola. In the Government's case in chief, the Court received into evidence six exhibits: the resume of Mr. Sheriff (Ex. 1), the resume of Dr. Kadehjian (Ex. 6), and the four PharmChek chain of custody forms for each sweat patch used on Pangelinan, together with the CRL Lab Report and photos taken by the USPO Officers of Pangelinan on the days the patch was affixed on his person, and on the days the patch was removed from his person (Exs. 2–5). All four CRL laboratory reports show a confirmed positive presence of methamphetamine and amphetamine. (Exs. 2 at 2; 3 at 2; 4 at 2; 5 at 2.) As mentioned *supra* § II., the dates on which each of the sweat patches were applied and removed are:

September 23 and 30, 2024 ("first sweat patch");

October 17 and 21, 2024 ("second sweat patch");

November 1 and 5, 2024 ("third sweat patch"); and

November 12 and 18, 2024 ("fourth sweat patch").

In addition to using the sweat patches to monitor Pangelinan, both of the USPO Officers who testified also performed random UA tests on Pangelinan on days he was not wearing the patches, beginning on September 19, 2024 through November 25, 2024. All eight USPO UA tests yielded negative results, and all were within the normal range for urine specific gravity level ("SGL") after

being tested for dilution by a refractometer. Had a urine sample indicated a level outside the normal range (between 1.004 to 1.035 SGL) it would have been sent to the laboratory for further testing. None of Pangelinan's USPO UA tests were sent to a laboratory based on abnormal SGL levels; however, the USPO UA test taken on November 8, 2024 was sent to a laboratory for quality assurance purposes only and returned with a negative result.

To refute the positive test results of the four sweat patches, Pangelinan introduced UA test results conducted on him by the CNMI Superior Court Drug Court officers around the same time he wore the four sweat patches, starting on August 20, 2024 through December 2, 2024. The numerous Drug Court UA test results——seven in August, thirteen in September, eleven in October, nine in November, and one in December——were all negative for illicit substances. (Exs. A-001, A-027, B.) Pangelinan also presented two witnesses: Frankie Benavente Camacho, Community Supervision Officer of CNMI Drug Court; and Timothy Rabago, Case Manager at CNMI Drug Court. Pangelinan's witnesses testified to the content of and circumstances surrounding Pangelinan's Drug Court UA tests. Mr. Camacho testified that none of Pangelinan's negative Drug Court UA test results were sent to a laboratory for further testing because the samples all had initially tested negative.

**B. The Government proved by clear and convincing evidence that Pangelinan violated a condition of his pretrial release.**

In a hearing to revoke pretrial release of a defendant, the Government must prove by "clear and convincing evidence that the person has violated any . . . condition of release" other than committing a federal, state, or local crime. 18 U.S.C. § 3148(b)(1)(A)–(B). The clear and convincing standard is more demanding than preponderance of the evidence "and requires that the government 'prove [its] case to a higher probability than is required by the preponderance-of-the-evidence

6

standard.'" *United States v. Jordan*, 256 F.3d 922, 930 (9th Cir. 2001), *overruled on other grounds by United States v. Lucas*, 101 F.4th 1158 (9th Cir. 2024) (quoting *California ex rel. Cooper v. Mitchell Bros.' Santa Ana Theater*, 454 U.S. 90, 93 n.6 (1981)). "[C]lear and convincing evidence 'indicat[es] that the thing to be proved is highly probable or reasonably certain. This is a greater burden than preponderance of the evidence, . . . but less than evidence beyond a reasonable doubt . . .'" *Id*. (quoting BLACK'S LAW DICTIONARY 577 (7th ed. 1999)). In this case, the Government proved by clear and convincing evidence that Pangelinan had violated a condition of his pretrial release; the four positive sweat patch results and witness testimony established that Pangelinan had used methamphetamine on at least four occasions.

### 1. The Confrontation Clause does not bar admission of the sweat patch test results into evidence.

As an initial matter, the Court overruled Pangelinan's objection under the Confrontation Clause of the Sixth Amendment to the admission of his four sweat patch test results into evidence. In detention proceedings, "the accused has no right to cross-examine adverse witnesses who have not been called to testify." *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986) (citing *United States v. Delker*, 757 F.2d 1390, 1397–98 (3d Cir. 1985)); 1 NINTH CIRCUIT CRIMINAL HANDBOOK § 2.02 (2024) (citing *Winsor* and explaining accused has no right to cross-examine adverse witnesses who have not been called to testify). Thus, Pangelinan's objection was overruled on this basis.

The Court is aware that individuals on supervised release hold a due process right to confront adverse witnesses against them during their supervised release proceedings, though this right is not absolute. *United States v. Hall*, 419 F.3d 980, 985–86 (9th Cir. 2005) (citing *Morrissey v. Brewer*, 408 U.S. 471 (1972)). Even assuming that individuals hold the same due process right during detention

proceedings, no violation of Pangelinan's due process rights occurred. "To determine 'whether the admission of hearsay evidence violates the releasee's right to confrontation in a particular case, the court must weigh the releasee's interest in his constitutionally guaranteed right to confrontation against the Government's good cause for denying it.'" *Id.* at 986 (citing *United States v. Comito*, 177 F.3d 1166, 1170 (9th Cir. 1999)).

In *United States v. Martin*, the Ninth Circuit found that a releasee's *Morrissey* rights had been violated when the district court revoked the releasee's supervised release and sentenced him to imprisonment based on two laboratory urinalysis reports. 984 F.2d 308, 309 (9th Cir. 1993). In so finding, the Ninth Circuit had considered "the importance of the [laboratory reports] to the [district] court's ultimate finding, the virtually complete denial of any opportunity to refute the evidence, and the consequences of the court's finding" *Id.* at 311. *Martin* is distinguishable from this case. Whereas there was a "nearly complete denial of *any* confrontation" in *Martin*, *id.* at 311, Pangelinan had the opportunity to and confronted the Government's four witnesses: Mr. Sheriff, Dr. Kadehjian, and USPO Officers David-Atalig and Arriola. Unlike the *Martin* releasee who only had the opportunity to cross-examine the counselor who collected his urine samples and who "was unable to shed any light on chain of custody or testing procedures," *id.* at 312, Pangelinan had the opportunity to cross-examine both the individuals who collected his sweat patch samples——USPO Officers David-Atalig and Arriola——and witnesses who had extensive knowledge of the chain of custody and testing procedures related to the testing of Pangelinan's sweat patches——Mr. Sheriff and Dr. Kadehjian. Accordingly, even if a due process right to confront adverse witnesses exists for individuals facing detention proceedings, the admission of Pangelinan's four sweat patch results in this case did not

8

violate his due process rights.

### 2. Pangelinan's positive sweat patch test results demonstrate methamphetamine use.

The four sweat patches worn by Pangelinan were PharmChek sweat patches. (Exs. 2 at 1; 3 at 1; 4 at 1; 5 at 1.) As Dr. Kadehjian testified, sweat patches are collection devices that capture the sweat of the individual they are affixed to. Individuals eliminate drugs they have used and drug metabolites in their sweat. Sweat patches can generally be worn effectively for up to two weeks. The sweat patch device has been approved for use by the U.S. Food and Drug Administration ("FDA") and the Administrative Office of the U.S. Courts——sweat patches are used in many district courts throughout the country.

The test results for Pangelinan's four sweat patches were produced and certified by CRL. (Exs. 2 at 2; 3 at 2; 4 at 2; 5 at 2.) Mr. Sheriff testified to CRL's testing procedures. Sweat patches should arrive at CRL as sealed samples; samples that arrive at CRL unsealed are rejected for testing. Once received, the sealed samples are batched into groups. An accessioner, the individual who is responsible for bringing the sample into CRL's system, then sorts and unpackages the samples to their individual sample packaging. Next, each sample is applied with an internal specimen identification number, which follows the sample throughout the testing process. The sample is then screened for analytes——such as methamphetamine and amphetamine——using immunoassay technology. If the screening yields a negative result for all analytes, the test result is released to the client as a negative result. If the screening yields a presumptive positive result for any analyte, the sample then undergoes confirmation testing through the liquid chromatography-mass spectrometry ("LC-MS") process. The confirmation process tests for the specific analytes the sample yielded a presumptive positive for and

the quantity of such analytes. Subsequently, a certifying scientist reviews all of the gathered data; if the data satisfies CRL's quality-control criteria, the test results will be released to CRL's client. To prevent contamination, each sample is identified with a specimen identification number, CRL personnel are trained to handle one sample at a time, and all personnel must wear protective equipment. The sweat patch testing procedure utilized by CRL has been approved by the FDA. Further, CRL is certified by the Substance Abuse and Mental Health Services Administration ("SAMHSA"), which administers the national laboratory certification program for the testing of federal regulatory samples.

The evidence received indicates that CRL's procedures were followed in the case of the handling and testing of Pangelinan's four sweat patches. Although Mr. Sheriff did not personally test any of Pangelinan's sweat patches or certify the test results, the testimony at the hearing established that Mr. Sheriff would likely have known if any deviation from CRL's procedures had occurred based on his role as regulatory compliance manager. Further, the chain of custody form for each sweat patch contains three certifications that the required procedures were followed: by the individual who applied the patch, by the specimen donor, and by the individual who removed the patch. (Exs. 2 at 1; 3 at 1; 4 at 1; 5 at 1.) Lastly, a series of letters and numbers printed on each sweat patch is visible in the photos taken of Pangelinan on the days the patches were affixed on and removed from his person; each of these series is included in the corresponding CRL test report within the "ID" field. (Exs. 2 at 2–4; 3 at 2–4; 4 at 2–4; 5 at 2–4.) Thus, the Court accepted CRL's test results for Pangelinan's sweat patches as reliable. Accordingly, the Court accepted that 1) Pangelinan's first sweat patch was positive for methamphetamine in the quantity of 361.0 nanograms (ng)/milliliter (mL), and that amphetamine was present in a quantity between 2.0–9.9 ng/mL (Ex. 2 at 2); 2) Pangelinan's second sweat patch was

positive for methamphetamine in the quantity of 390.0 ng/mL, and that amphetamine was present in a quantity between 2.0–9.9 ng/mL (Ex. 3 at 2); 3) Pangelinan's third sweat patch was positive for methamphetamine in the quantity of 76.0 ng/mL, and that amphetamine was present in a quantity between 2.0–9.9 ng/mL (Ex. 4 at 2); and 4) Pangelinan's fourth sweat patch was positive for methamphetamine in the quantity of 148.0 ng/mL, and that amphetamine was present in a quantity between 2.0–9.9 ng/mL (Ex. 5 at 2).

Given the four positive test results, which demonstrate the presence of both methamphetamine and amphetamine, the Court found that Pangelinan had used methamphetamine on at least four occasions. As Dr. Kadehjian explained, CRL requires the presence of amphetamine in a sample in order to release a positive test result for methamphetamine to a client, as the presence of amphetamine rules out "innocent exposure" explanations for the presence of methamphetamine in a sample. Because methamphetamine does not convert to amphetamine in the environment and only does so when it gets into the body, the presence of both methamphetamine and amphetamine in a sample provides confidence that the donor ingested methamphetamine. Given that all four of Pangelinan's sweat patch tests detected the presence of both methamphetamine and amphetamine, the Court found that each test corresponded with Pangelinan's methamphetamine use. Further, based on the timing of the removal and subsequent application of each sweat patch, the Court found that Pangelinan used methamphetamine on at least four separate occasions. Both Mr. Sheriff and Dr. Kadehjian testified that sweat patch testing can typically detect methamphetamine that is present in the donor's system while the sweat patch is worn and up to two days prior to the date the sweat patch is applied; detection of methamphetamine that is present in the donor more than two days prior to application of the patch

is rare.[1] Given that there were at least seven days between the removal of each sweat patch and application of the next patch, no two positive sweat patch results were redundant——each captured at least one discrete incident of methamphetamine use.

### 3. Pangelinan's negative UA tests results are reconcilable with his positive sweat patch tests and methamphetamine use.

To refute the positive sweat patch test results, Pangelinan presented numerous negative Drug Court UA tests. However, while evidence at the hearing established the UA testing at issue to be reliable, the Court found that a negative UA test result was still consistent with methamphetamine use given the cut-off level for the UA tests.

Mr. Camacho, Community Supervision Officer at CNMI Drug Court, testified that the Drug Court administers UA tests manufactured by Precision Plus. The UA test kits are not FDA certified. Mr. Camacho testified that he sees Pangelinan at least three times a week for drug testing. The Drug Court administers UA tests that test for both methamphetamine and amphetamine. The Drug Court maintains procedures for officers to ensure that donors provide unadulterated urine samples, including by noting the color and temperature of the sample. Further, the UA tests contain a dilution panel which measures the specific gravity, creatinine, and potential of hydrogen (pH) levels of the sample; these levels are indicators of whether a urine sample has been diluted. If a urine sample tests outside of the normal range for these indicators, the Drug Court officer can reject the sample or send it to a laboratory for further verification. Mr. Camacho testified that he usually pursues the latter option.

---

[1] At the hearing, Mr. Sheriff testified that for chronic users, sweat patch testing can detect more "lipophilic" drugs (such as THCA) that are present in a donor seven to ten days before a sweat patch is applied. Mr. Sheriff maintained that the detection window for methamphetamine was one to two days before a sweat patch is applied.

Based on the testimony of Mr. Camacho and Mr. Rabago——Case Manager at CNMI Drug Court——the Court was satisfied that the Drug Court maintains sufficient procedures to detect circumstances in which urine samples are adulterated, and that Pangelinan's samples were not adulterated in this case. Further, USPO Officer David-Atalig testified that USPO administered five UA tests on the same days that the Drug Court had, all of which returned negative results. One of these UA tests had been sent by USPO to a laboratory for further analysis, and had again returned a negative result. The negative USPO UA test results confirm the reliability of the negative Drug Court UA test results. Lastly, Dr. Kadehjian testified to the reliability of the analytical method underlying UA tests. Like the analytical method underlying sweat patch testing, UA testing utilizes both immunoassay and LC-MS scientific processes. Thus, the analytical methods for sweat patch and UA testing are comparable and both accurate.

However, a negative test result——whether for a sweat patch or UA test——must be viewed in the context of the test's "cut-off value." As Dr. Kadehjian noted, a negative result for an analyte does not mean there is no presence of the analyte in a given sample; a negative result merely means that the analyte was detected in a quantity below the cut-off value. Based on Dr. Kadehjian's examination of images of the Precision Plus UA test device, packaging, and package insert, he testified that the cut-off value for the Precision Plus UA tests with respect to both methamphetamine and amphetamine is 500 ng/mL. In other words, if the Precision Plus UA test detected the presence of either methamphetamine or amphetamine at a quantity less than 500 ng/mL, the test would return a negative result. In contrast, the cut-off value for the sweat patch tests with respect to both

methamphetamine and amphetamine is 10 ng/mL.[2] Thus, it would be clinically consistent for a sample containing between 10–500 ng/mL of methamphetamine to produce a negative Precision Plus UA test result, but a positive sweat patch test result. All four of Pangelinan's sweat patch test results detected the presence of methamphetamine in a quantity between 10–500 ng/mL. Thus, the negative Precision Plus UA test results *are consistent* with the positive sweat patch test results, and both sets of test results are consistent with methamphetamine use.

### 4. Evidence about Pangelinan's behavior is indeterminate.

Defense counsel argued that Pangelinan's behavior was inconsistent with methamphetamine use in several aspects. First, defense counsel emphasized the testimony of Mr. Camacho and Mr. Rabago, Drug Court Officers who had not noticed any signs of drug use in Pangelinan since May 2024. Second, defense counsel argued that it would be very difficult for Pangelinan to produce consistently negative UA test results if he had used methamphetamine. Defense counsel argued that Pangelinan would have to be very sophisticated about the quantity and timing of his methamphetamine use in order to test negative consistently in Drug Court. Further, defense counsel argued it would be very difficult for a chronic user such as Pangelinan to refrain from using larger quantities of methamphetamine once he had used a small amount. The Court noted defense counsel's arguments, but recognized the existence of high functioning methamphetamine users. In light of this and the four positive sweat patch test results, the Court found that Pangelinan used methamphetamine on at least four occasions and the Government had met its burden to prove by clear and convincing evidence that

---

[2] While the sweat patch test's cut-off value for a "positive" amphetamine result is 10 ng/mL, the sweat patch test will return a "present" result for amphetamine if it is detected at a quantity between 2.0–9.9 ng/mL during the confirmation stage of the testing process.

Pangelinan violated a condition of his pretrial release.

### C. The Court denied the Government's Petition to revoke Pangelinan's pretrial release because 18 U.S.C. § 3148(b)(2)(B) was not satisfied.

After the Court announced its finding that Pangelinan had violated a condition of his pretrial release, the Government argued that revocation of Pangelinan's pretrial release was appropriate under 18 U.S.C. §§ 3148(b)(1)(B) and (b)(2)(B) because the Court found by clear and convincing evidence that Pangelinan violated a condition of his release, and should find that Pangelinan is unlikely to abide by any condition or combination of conditions of release. Although the Court found the former was satisfied, the Court did not find that the latter was satisfied; the Court did not find that Pangelinan was "unlikely to abide by any condition or combination of conditions of release" under Section 3148(b)(2)(B). Instead, the Court accepted defense counsel's recommendation and modified Pangelinan's conditions of pretrial release to include home confinement at his sister's residence with electronic monitoring. The Court ordered that the other conditions of Pangelinan's pretrial release remain in place. Given the support of Pangelinan's sister——Jane Lizama, the low quantities of methamphetamine measured in Pangelinan's sweat patch test results suggesting he was attempting to overcome his addiction, and the importance of allowing Pangelinan to continue accessing Drug Court resources, the Court modified the conditions of Pangelinan's pretrial release rather than revoked his release.

### V. CONCLUSION

For the foregoing reasons, the Court found that the Government met its burden under 18 U.S.C. § 3148(b)(1)(B) to prove by clear and convincing evidence that Pangelinan violated a condition of his pretrial release. However, the Court did not find that Pangelinan was "unlikely to abide by any

15

condition or combination of conditions of release" under Section 3148(b)(2)(B). Accordingly, the Court DENIED the Petition to revoke Pangelinan's pretrial release.

       IT IS SO ORDERED this 6th day of January, 2025.

                                                       RAMONA V. MANGLONA
                                                       Chief Judge